v. Fluor Federal Solutions. Mr. Lippe. Yes, Your Honor. Good morning. Appreciate it. We're here seeking recovery on behalf of Mr. Jamison, a retired police officer hired to handle security for the North Texas Job Corps Center who amazingly thought that it was his duty to see to it that federal and state law was to be complied with and repeatedly, repeatedly complained about violations of the Department of Labor's zero tolerance policy, repeatedly informed the local police department of drug sales, drug usage, student rapes, all sorts of violence occurring on campus and was punished, retaliated against as a result. This is a retaliation claim under the False Claims Act. The courts have made it clear that there are essentially three elements of that cause of action that our complaint needs to address. Number one, why did the employee engage in protected activity? Number two, was the defendant aware of his actions? And number three, was there retaliatory action that took place as a result of or that was caused by the awareness of his engaging in protected activities? We have delineated a number of protected activities that did occur. He observed violations of the drug laws, reported these to the police department, and then his supervisor chastised him for it and told him to stop. When he wouldn't stop, he was threatened with firing. He investigated rapes that occurred on the Job Corps campus and as a result of that, the responsibility for investigating those types of things was taken from him, in effect a demotion, a retaliatory action, and given to the EEOC coordinator. Strange to take that away from the security officer and move it to someone in charge of EEOC. He noted that there were a number of other violations that were occurring. I don't think anybody is going to doubt that he was reporting violations to the police and I doubt that the other side will assert that this was not, you know, reports of illegal conduct or arguably protected activity. Yes. So it's the other parts of your argument that are more in dispute here. There are arguments on the part of the defendant that, well, oh, these are two separate corporations. They're just totally separate. Well, they are. That's the problem, isn't it? Well, they're not separate and independent. You look at the subcontract and one of the very first things stated in the agreement is that these two companies work together to jointly obtain the contract. They recognize and agree that they are to work together in performing the contract. Delgin Was this one of these things, to be very blunt about it, where the contract was ordered, let to a woman-owned business and she couldn't handle it on her own and she had to subcontract to his employer? Not so much that it was a woman-owned business, but because it was a new business that had no experience, Delgin, now Floor, had massive experience in managing federal contracts, and male or female, to have a company with that kind of background working with you and they recognized that. The key here is that Mr. Jameson was hired as security officer over the entire campus and his supervisor initially was with Delgin and at some later time, and we're not sure when, moved over to Career Opportunities, the main contractor. However, this, and this is critical, we have alleged in our complaint that these were operated as one. You didn't walk into the Job Corps Center and, okay, here's a section for COI, here's a section for Delgin. There's one entity operated as a unity. They had weekly management meetings. Who was the head person at that job facility? I'm real bad about the names. It was Amitai Okorin or something like that was the director of the, the overall director of the center. And who was he working for? He was an employee of Career Opportunities, and there, but the key that I want to emphasize- Martin and Kite worked for Career Opportunities. Kite worked for Career Opportunities. Martin started off working for Delgin and at some later time moved to COI. But here's where the interrelationship is so critical. You had COI supervising a Delgin employee under the subcontract. Delgin was responsible for, for security, but you had the, the overall company supervising him and telling him what he could and couldn't do. And as a result of that, if you're going to try to impute knowledge to, to, to Delgin and Floor, not only do you look for actual knowledge, which I believe can be demonstrated by the fact that there were weekly management meetings, which we've alleged that he was chastised in these weekly management meetings, and then he was removed from the weekly management meetings as part of the retaliatory acts after he kept insisting on trying to comply with the DOL regulations. This court wrote in Sharp v. City of Houston that you can not only look to actual knowledge, but you can look to constructive knowledge. If the harassment, I'm reading from Sharp v. City of Houston, cited in the brief, if the harassment complained of is so open and unknown of it, had it but opened its corporate eyes, it is unreasonable not to have done so, and then there is constructive action. It cannot be stated reasonably and, and believably that the two- Who, who, who were the Delgin employees who were present at these weekly meetings besides Mr. Jamison? I don't recall the names of- Did you allege names of those people? I believe we did. I don't recall that, but I'll take your word for it. I don't recall specifically either. I can look that up and, and respond in the rebuttal, but they were attended by the people that were the head of all the different departments, and Mr. Amaran, the center director, was the one running it. Ultimately, Mr. Jamison was fired, and he was fired by Delgin, the defendant in this case, and- No, he was fired by Floor after Floor came on, right? Well, I believe originally Delgin was a subsidiary of Floor, and then at some point he was merged into Floor. So when I say Delgin- But it was new, it was a different person who was in the HR who fired him, was it not? Yes, and that brings up another point on our appeal. She testified, Beverly Sharp testified, that Mr. Jamison was fired after we conducted an investigation, and we sought to subpoena that investigator's report. She testified that she was advised by the investigator certain things, and that those things were the basis of the termination. We believe that that was a case determinative report, and so at an early stage, we sought to subpoena that. The court granted the motion to quash the subpoena, and part of our appeal is that we have alleged retaliation as a probably the smoking gun. There was no mention of involvement of counsel when Ms. Sharp testified in her deposition, so it's not a- When was she deposed? In connection with the False Claims Act case, or what? It was, yes, in connection with the False Claims Act case, and so we presented her testimony, in our briefing, and in our motion to the district court, and it was the discovery was denied without prejudice, which I believe, I can't speak for the court, but I believe it meant that, well, you go do the discovery later on. So there was clearly knowledge on the part of the employer, and we have recited numerous retaliatory acts. He wasn't just fired, ultimately, although that was very- there was an extreme act of retaliation. He had his responsibilities reduced. Employees were instructed not to report information about student misbehavior to him. Well, as you probably know, the case law is pretty exacting about what constitutes an actionable employment, adverse employment situation, so the level of alleged mistreatment here probably doesn't qualify. Termination is another matter. Well, in my view, in U.S. XRL Bias v. Taglo Pahoa Parish School Board, March of 16, which is cited in our brief H-16, F-3-3-15, this court wrote that the court has not examined in any depth what constitutes retaliation. Analyzing other whistleblower statutes, as under Title VII, a retaliatory act must be materially adverse, which means it well might have dissuaded a reasonable worker from engaging in protected activity. And in that case, there was a transfer of the marine from one area to another. The courts have recognized that it is broader than mere termination. Breaux v. City of Garland. Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands. Breaux v. City of Garland from this court in 2000, citing an earlier case, Pierce v. Texas Department of Criminal Justice. So the adverse employment actions were numerous, and they were escalating. He was reprimanded and threatened with firing. He was cut off from investigating certain types of illegal acts. He was, again, threatened with firing. Whatever happened to the U.S. attorney's participation here? The U.S. attorney participated, investigated, and they declined intervention. We disagreed with that. They never took any separate action against the senator? They did not, and we don't know why. That's around 2015, 14, something like that. Yes. We still have a case pending against career opportunities in the district court. Oh, you do? Yes. So what's the basis of that? Well, it's the same activity. Was that consolidated with this one? No. Oh, okay. No, the actual . . . Maybe I knew that. And, of course, the standard of allegations in this case are not that of 9b, as the court made it clear. So I believe . . . And that is, would we have to make new law here to say that your allegations are sufficient to proceed against Floor, even though there is no actual pleading of Floor's actual knowledge here, apart from your weekly meeting business? I don't believe that there's an absence of pleading actual knowledge. We're asking for a reasonable inference to be drawn that the two companies working together knew exactly what each one . . . what the other one was doing. And in Gonzales v. Kaye and McClendon v. Ard from this court, plausible under Twombly means pleading facts that allow the court to draw a reasonable inference that the defendant is liable. We have pled that the two companies were working together. We have pled that COI was supervising and instructing and threatening Mr. Jamison. We have pled that he was ultimately fired, but leading up to that firing, multiple retaliatory acts. Who was the . . . Okay, one other quick question. Who was the top DJI person present at the facility? It was Maria Martin until she moved over to Floor, and after that, I don't know who the top DJI person would be, other than Mr. Jamison. Okay. I believe as the head of security, he had perhaps the highest level, because he was hired upon instructions of the FBI that somebody with that experience be put in that position. Okay. Thank you. We'll hear next from Mr. Duffy. Good morning, and may it please the court. The district court's decision should be affirmed in all respects. In the short time I have here, I have four points to make. The first is, did this court directly dismiss the complaint? Because after three previous attempts, Mr. Jamison did not allege facts from which it could plausibly be demonstrated that any decision maker at Floor was aware that Jamison had engaged in activities protected by the False Claims Act. Number two, and there was some discussion about this from my colleague a few minutes ago, although he attempted to bootstrap the claim that certain employees of COI, Career Opportunities, and this is Ms. Kite, Ms. Martin, and Mr. Amaran, claimed that they were aware of his protected activity. He did not sufficiently allege that any of those individuals were aware of False Claim Act protected activity. There was certainly some discussion about not enforcing the law. There were some allegations concerning not enforcing the memorandum of understanding with the McKinney Police Department, but nothing to suggest to put those three individuals on notice that the False Claims Act, that is a false submission of fraudulent claims to the government, that that was the nature of his complaint. But in any event, he could not show that the knowledge of Kite, Martin, and Amaran could properly be imputed to my client, Floor. And when we talk about Floor, Your Honors, where it's interchangeable with Delgin and Floor for this purpose, as the Court's last question indicated, to reverse this decision, you would have to make new law. Their theory is that because of a subcontracting agreement, the knowledge of the subordinate is, I'm sorry, the knowledge of the superior is imputed to the subordinate, a sort of reverse. Do we know who the prime contractor in the sub is? Well, in the contract, it specifies that the prime contractor is Career Opportunities, Inc. My client was a subcontractor and provided the delegation of certain functions at the center. The functions included security. That is, Delgin was responsible and Mr. Jamison, as the head of security, was responsible for ensuring that the law was being followed and security there. The contract makes clear, as most subcontracts, that the parties were independent contractors and neither was an agent of the other and that each was responsible for their own employment decisions. So the notion that an employee of Career Opportunities, whatever knowledge they might have, would be necessarily imputed to Floor would require the Court to essentially take the position that a principal's knowledge can be transmitted to a subordinate. There is no law to support that issue. We briefed that at the Court below and to the Court here. Well, I understand that argument. He was alleging that there were weekly management meetings and that somebody else from Delgin must have attended those meetings and thereby Floor had to know what was going on. Well, Your Honor, two things about that. Number one, this isn't a situation where Mr. Jamison was a stranger to the process. He was actually, according to their allegation, in the room and would be able to identify what Floor employees were there. As the Court's question to my colleague noted, there's not a single identifiable Floor employee in the four corners of the actual allegations of the complaint. The only reference to a Floor employee is in the exhibits and that is the actual termination letter, Ms. Lovett, who terminated his employment, but there's nothing to suggest that an identifiable Floor employee was aware when Mr. Jamison made whatever complaints he made. Here's the other thing. The actual complaints that Mr. Jamison made would not have put Floor on notice that he was engaging in FCA-protected activity. We cited the sealed appellant versus sealed appellee case, which is directly on point. There we had a compliance officer whose job it was to make sure that the company was complying with the requirements, which included patient signatures. The appellant in that case complained to his employer, you're not submitting signed patient signatures and as a result, you're sending fraudulent claims to the government for reimbursement, and this Court held that that would not have put the defendant on notice that he was making a False Claims Act allegation because the nature of his job was ensuring that things like patient signatures were there. Well, at some point, there's the allegation that Mr. Jamison told Ms. Martin that they were committing fraud. Well, here's the problem. Ms. Martin, at the time that statement was made, is a Career Opportunities employee. Did she transfer over to Delgin or was she fired? The, there's nothing in the record to suggest that, but we happen to know that she was hired by Career Opportunities. There's some suggestion in the pleadings that Ms. Kite had some relationship with Ms. Martin and that there was a hand-in-glove relationship between the two of them. But she was not fired? No, Your Honor, and there's no, there's no record. Okay, I misread something. There's nothing in the record to suggest that, but in terms of her employment, exhibit six, I believe, yes, to the third amended complaint, which is at record 1318, clearly has the letterhead of Mr. Amaran as the center director, who's the head of the center, Maria Martin as deputy center director. The complaint that Mr. Jamison filed on January 1st, 2014, which is also attached to the complaint at record 1321, where he specifically identifies Ms. Martin and Mr. Amaran as employees of Career Opportunities, Inc. In that situation. That was, what date is exhibit six? Your Honor, exhibit six is August 14th, 2013, well before the, the culminating events that resulted in his termination and exhibits. But he wasn't fired until 2015. That's correct. January 1st is the, is exhibit seven. So somewhere far down the road, Ms. Martin had become an employee of COI, and it's, it would strain the law. You would have to ignore well-settled law to suggest that Ms. Martin's knowledge can be imputed to Fleur without some allegation that Martin communicated that to somebody at Fleur or that she transmitted. Simply the fact that Mr. Jamison had these conversations with Ms. Martin would not put my client on notice of anything. Here's, here's the bottom line here. The plaintiff has, has had a essentially a studied ignorance of the identity of any of the parties in the case. Mr. Jamison has control of those facts. He was at the project. He knew who was there. He knew who he interacted with. He knew who he was talking to. And when he talked to Ms. Martin, he knew that Ms. Martin was an employee at COI, but the complaint says nothing about that. He also knows who fired him, and the complaint says nothing about that either other than the attachment. This is a situation where the plaintiff had, was on notice at a very early point in the case. We, our first motion to dismiss, our second motion to dismiss, the court, Judge Boyle's decision all said, look, you may or may not have a false claims retaliation protected activity, but you've not tied any of those activities or any of those statements of Martin or of any of these identifiable individuals to my client. That is the problem. And it doesn't require that whatever, whatever. I'll just ask you a little question here because you're, you're painting Mr. Jamison as the most inscrient, but was it the fact that this job training center was basically caring and feeding for legal violators, scoff laws? I'm sorry, Your Honor? Well, the whole point of what he was saying was that the job training center was ignoring that when people come to that center supposedly to get their lives in order, that they can't take drugs and alcohol on the premises and all that business and that the center was ignoring those obviously reasonable restrictions. And certainly we don't dispute that those allegations are clearly stated in the complaint. The problem is really twofold. How do you get from you're not following the law, you're not arresting miscreants, people are doing drugs and they really ought to be in prison because the memorandum of understanding that we have with the police department says so. There's nothing to tie any of those activities to false claims to the government. That is, there's no allegation that is. It seems to me it would be pretty material to the government to know if a job training center is, is housing felons or housing lawbreakers instead of following its rules and, and doing its job. Well, it, it may. That seems to me like the element of a, a material false claim. Well, in point of fact, Your Honor, the Escobar case made clear that all violations of the conditions of the contract don't necessarily apply. I understand that. I'm just telling you this seems to me on its face to meet the Escobar standard and I believe his False Claims Act case was, and I haven't, I've neglected to check into that decision before I, it was not eliminated on that basis. Well, the False Claims Act case, the Jamison versus Delgin case, which this court affirmed a motion to dismiss, was eliminated on the very point that I'm making here, which is it may or may not be protected activity, but how do you get more federal solutions into the business? He might have a claim of retaliation against COI. He might have a smoking gun with Maria Martin. He might have a smoking gun with, with Ms. Kite, but none of those are smoking with floor federal solutions, which is my client, and that's the, the, the gaping hole in his allegations. And it is clear that Mr. Jamison, as a person on those premises, and I'm not, I'm not trying to paint Mr. Jamison as a scofflaw, I am painting him as a person who has personal knowledge of who's who, who was employed by who, and who was acting on whose behalf in terms of the people that he was interacting with. And there's nothing in the four corners of the complaint that identifies a single identifiable floor employee who is supposedly, in a respondeat superior way, responsible for any action that was taken against him other than the termination. That is, Exhibit 7 is a termination letter from Beverly Lovett. And by the way, just to correct the record, Ms. Lovett was, deposition was taken in this case, in the retaliation case. Discovery was conducted, initial disclosures, the parties had a fair amount of discovery prior to the filing of the Fourth Amendment complaint. So it's not like the typical 12B6, where this court has been very clear, most 12B6 cases are decided at the onset of the case with zero discovery. This is a case where the plaintiff had the opportunity, and the record is clear, he took the deposition of the decision maker, and had the opportunity to identify who knew what, when, where, how. How is Ms. Martin connected to the process? Who's really running things? What's the nature of the subcontract, and is this really a farce that they're all one entity? There's no allegations to make any of that stick. All we have is a subcontract agreement, and if you look at the four corners of the subcontract agreement, it is a standard subcontract agreement. It is not a agreement where it says, Fleur, you're going to be held responsible for anything that Career Opportunity does. In fact, it says the opposite. Is that a matter of pleading deficiency, or legal? It's both, Your Honor, in the nature of the pleading that he made, which is, there are no allegations that would suggest that the subcontract arrangement was merely a pass-through. But even if it were a pass-through, you still have to get by the fact that they are two separate legal entities that are separately operated, and the agents of one operator, namely the employees of Fleur, their knowledge, if any, isn't directly imputed to Career Opportunities, and vice versa. How adaptable would this theory of separate control be to the typical false claims case, which is made against a defense . . . or that we see, made against a defense contractor who could subcontract out maintenance . . . let's say design and maintenance of the aircraft engine from the tail assembly, from the computer innards, and so on, and therefore split up all the responsibilities, so, no, there couldn't be a practical false claims case? Well, there could be a practical false claims case in just this sense. If you're talking about the component, each component is being provided as part of the subcontract, and they're making their way up the line. The actual contractor then goes to the government and says, this plane is A-OK. I'm giving it an airworthy certificate, or whatever it is people that make airplanes tell the government. That is, they're making a representation as a condition for getting paid, and there's subsidiary representations that are made up the line. In most of those cases, you're usually holding the contractor liable, and that's why we have a False Claims Act case in federal district court in Dallas involving COI. The actual contractor that they believe made false representations to the government is still there in the Key Tam case. The problem with this court in the Jamison versus Delgin case, and the problem here is, there's nothing to tie the nexus to the responsibility of my client, namely, Fleur Federal Solutions, formerly known as Delgin. There's not a single identifiable person. There's not an allegation. If there was a meeting in which he made a fateful claim, it's not there. There's no allegation as to what he said, and there's no allegation as to who was there when he said it, such that it would have put my client on knowledge at the time it made the decision. As a matter of correction, this court has made clear in the Jefferson County case, I believe it is, that they made clear that actual decision-maker knowledge, not constructive decision-maker knowledge, is necessary. Robinson versus Jackson State, which we cited in our brief, that it's not enough to say that there's general corporate knowledge of activities. That might, if the court were to accept that, I still don't think that that's- Is that a false claims retaliation case? No, Your Honor. It was a- It's a 1983- I'm sorry, Your Honor? The court has made clear that in all ranges of retaliation case, I believe it was a Section 1981 case, but it's been cited in Title VII cases and a couple of other cases, that essentially it may be the law in other circuits, because the appellant in that case cited a Second Circuit case that said corporate knowledge is enough. The Robinson case said, no, we want you to actually tie it to the decision-maker. Now here, Mr. Jameson had access to the decision-maker. This is a unique 12B6 case. This is one, even though Twombly and Iqbal says we aren't opening the doors to discovery for a person armed only with legal conclusions, this is a case where the district court actually opened up the discovery and allowed the plaintiff to take discovery of the decision-maker, interrogatories, documents, you name it. Before the 12B, I thought he said that discovery took place in the false claims case. And that's the record that I want to correct. The discovery was taken in this case, and the attachment in the record actually has the style of this case as the item. There was no discovery in the Key Tam case. That's a case where the judge stayed discovery or discovery was not allowed, but in our case, we had fairly full discovery for a 12B6 case with access to the actual decision-maker. And so any of the difficulties that a plaintiff might claim in being able to draw a straight line between his protected activity and the decision-maker, in a typical 12B6 case, the plaintiff isn't even allowed to have that kind of discovery. The decision is made, can you connect the dots with some factual allegations as opposed to legal conclusions? This is a case where he had access to the actual decision-maker, and there's nothing in this record, because if there was, he would have amended his pleadings to allege so that Ms. Beverly Lovett was somehow on notice, where Mr. Jameson had a conversation with Ms. Lovett, or Mr. Jameson sent an email to Ms. Lovett, or Mr. Jameson sent a complaint about I'm not being able to arrest these miscreants, and Ms. Lovett is somehow in the decision chain. Ms. Lovett is sort of an afterthought. Most of the allegations of the complaint are tying bad guys or bad people, Ms. Martin, Ms. Kite, and Mr. Amaran. All of those folks, there's not a single allegation that at the time they did any of the things that they are being tarred with, that at that time they were an employee or an agent of Fluor Federal Solutions. At all times they were employees of COI. With respect to the motion to compel, we've argued that the plaintiff has waived his appeal on that issue, that there's not any briefing or anything to suggest why the court was wrong in making a decision to deny the motion to dismiss without prejudice, but in any event, under Iqbal and Twombly, they're generally not allowed to have, or not necessarily having discovery. This court has made clear countless times. Most 12B6 decisions are made without the benefit of discovery, because in this case, it's not like the typical case, say ... You know what? I think you're repeating yourself. With that, and I notice my yellow light is on, Your Honor, unless there are further questions, we would ask that the court affirm the district court's decision in all respects. All right. Thank you. Mr. Lippe, rebuttal. Thank you, Your Honor. I stand corrected. The discovery, I agree with counsel, was taken in the termination case, not the whistleblower case. I reviewed the complaint. There is not an allegation of the names of everybody at the weekly management meetings. Instead, it says senior management positions. Much was said about the specificity of the complaint. Well, paragraph 24 of the Third Amendment complaint discusses the amnesty program that was established, which there was even a photo in discovery of a box called amnesty, where if you dropped your drugs and your weapons as you entered the campus, you would be given amnesty, and nobody would worry about that. Mr. Jameson, in paragraph 24, says all of this was a specific and intentional violation of the PRH, the DOL statutes, and DOL regulations. Plaintiff informed Martin that this was illegal and a violation of the regulations, and that failure to report these incidents fully and faithfully would amount to committing fraud against the government. Martin made it clear that she was not going to comply with plaintiff's recommendations and concerns. I think that's pretty specific. Now, the question that, the argument that I kept hearing over and over and over again was, well, you haven't pinned anything on Delgin. Please look at Exhibit 7 to the amended complaint, which is found at 10278.1322 of the record. Page 2 of Mr. Jameson's complaint, internal complaint made in January of 2014, says this. Very important. At this time, I am unable to fulfill all of my job responsibilities due to the direct interference of Mr. Amaran and Mrs. Martin. Mrs. Martin and Mr. Amaran have directed my immediate supervisor, Mr. Eddie Williams, Social Development Director at the North Texas Job Corps Center, to inform me that I would no longer conduct any investigations or complete any reports relating to security incidents that occur on the Job Corps Center. Under the subcontract, it is clear that, and this is page 1280, 10278.1280, the subcontract makes it clear that the Social Director is one of the responsibilities assigned to Delgin. So Mr. Eddie Williams, the direct supervisor of Mr. Jameson, was told by the Center Director and by Maria Martin, shut this guy down. And they did. And he complained that he was unable to perform his job duties as a result of that. And you're saying Mr. Williams was employed by Delgin? Eddie Williams was, yes. Now, so the adverse action by Delgin Floor, well it went upstream. Beverly Lovett wasn't even on the campus, but she was receiving information and instructions from these people. Argument that there's no allegation that the subcontract was a pass-through, well the subcontract itself says that a certain percentage of the funds collected would be passed on, would be paid to Delgin, the subcontractor. That's in the subcontract itself. What about failure to report? With the zero-tolerance policy that the job, that the DOL has imposed, with the zero-tolerance policy, if I report that I have X number of students on campus for which I'm paid, and I omit reporting these incidents, then I am, by omission, committing fraud against the government. The zero-tolerance policy is specifically alleged, and it is alleged how that was being violated, and Mrs. Martin knew that it was being violated, and she was told so by Mr. Jameson, and she basically told him to forget about it. The action that was taken by the government as a result of these, of the reporting and all that, they did investigate, and they did terminate the Job Corps contract that COI had. If anything, did Magistrate Judge Scholar say about Eddie Williams, do you recall? I don't recall that Judge Scholar discussed . . . she was a district judge at the time that the order was signed, Your Honor. I don't recall that she made any finding about Eddie Williams at all in her memorandum opinion. Okay. All right. Thank you very much. Thank you, Your Honor.